You're just getting warmed up, huh? All right. We're impressed that you can handle them both, but the state apparently has to send different lawyers. Yeah. Each one of them looks like a full-back, too. I'm sorry if I could just have a moment to get settled. Counsel, I have a couple questions. Well, I'll give you a chance to get started now. May it please the Court, my name is Linda Bell and I represent Clifton Bob. This is a first-degree murder case in which the lawyer conducted virtually no investigation. Counsel, let me ask a couple of questions. This is the one where three guys killed somebody and they dragged them behind a car for a half mile and all that? Yes, Your Honor. Is that right? And as I remember going into trial, one of them had rolled over and the other two were going to trial. And then right on the eve of trial, the second one, I think his name was M, rolled over, leaving Bob hanging out there all alone as the defendant. Is that right? That's correct, Your Honor. What happened, there was Mr. Bencoma, Mr. M, and Mr. Bob. Mr. Bencoma went to the authorities. I'll give these kind of people misters myself, but you go ahead. Very early on, and he made a deal with the prosecution whereby he pleaded guilty and he served a year in prison and has been off paper since 1996. Mr. Bencoma all along was going to testify against Joe M and Clifton Bob. Mr. M and Mr. Bob were going to blame it all on him. They were going to, right. Blame it all on the guy that pleaded. Correct. Now, what matters to me is, if I understand this right, the second guy, M, I think his name was? That's correct. He had rolled over on Bob at the very last minute, just before trial. Do you remember how long before trial it was? It was two months. It was sometime around November 10th. I don't know the exact date, Your Honor. Two months before trial? And the trial was set for January 3rd. I believe it actually started on January 4th. Do you know when Bob and his lawyer found out that M had rolled over? In November. They found out in November. Yes. The trial was set for what date? January 3rd of 1994. January 3 trial date. That's correct. So you sort of have a couple of weeks out of there, Christmas, when nobody can get anyone on the phone. So they've got maybe six weeks. Something like that. Okay. And as I understand it, at that point, Bob's lawyer said to Bob, we've got a whole different case here because instead of the two of us blaming it on the third guy that rolled over, you now have two witnesses against you. A whole different case. We need a continuance so we can do some investigation. And Bob said, no, let's get it over with. I wish that's what the lawyer had said, Your Honor. Unfortunately, because I think Mr. Bob would have agreed to a continuance, unfortunately what the lawyer said to him was not, this whole picture has changed. I'm not ready. I've never had an investigator working on your case. What he said was that it was maybe advisable for a continuance. It might be advisable to continue the case because the investigator told him there was additional investigation that could be done. He says in his hearing testimony, the evidentiary hearing testimony on page 695 of the EOR, he says, I think what I told Mr. Bob was that further investigation might develop some additional witnesses. That sounds like a lawyer-like way of saying exactly what I just said, just saying it a little less bluntly. Well, Your Honor, but what he goes on to say is not that the picture had changed, but that Mr. Bob and I had discussed a specific trial strategy at some length that involved basically attempting to shift the blame for this murder upon Harry Bencoma. And we agreed at that point we were prepared to go to trial without any additional witnesses or investigation. Now tell me this. They go to trial. They don't get a continuance. They lose. And the claim is the lawyer should have done some more investigation on M once M rolled over. I assume that that means he should have done more investigation so he could impeach M. In the post-conviction relief application, what I'm looking for is some showing of prejudice for not doing it, like affidavits or something. If only you'd done investigation, here's what you would have found out. And I didn't find it. Tell me where it is and what it is. Your Honor, and I apologize. I realize in reviewing the briefs that I had not laid out the prejudice argument as clearly as it had been in the first recommended petition, pages 15 to 22 of the excerpts, I believe, lay it out much more clearly. Additionally, there is 15 through 22. Additionally, there's an affidavit from our investigator on pages 39 through 47 that discusses what we discovered when we did investigation in the case. I think I have the same, sort of the same question that Judge Kleinfeld has. And you understand we don't confer on the merits before we come out. So two of us apparently have the same question. Your client, Mr. Bob, was charged, among other things, with conspiracy. Yes. And that was presented to the jury, and the jury convicted him of conspiracy. Yes. Which means to me that unless, that if he was present at the scene and had any understanding of what was going on and didn't disassociate himself at an early opportunity from what was going on, then he's responsible whether he did the stabbing, whether it was his idea to do it, whatever happened to the murder weapon, et cetera. Am I wrong about that? No, that's correct, Your Honor. However, Mr. Morrison received this list, which is on page 123 of the excerpts of letter, from Mr. Bob's sister prior to trial. It is a list of witnesses, and it is a list that explains what the witnesses would testify to. One of the witnesses on this list was Donald Bob. That's the brother. The brother. And he would have testified, and he did testify at the evidentiary hearing, that Joe M. told him that Clifton Bob was passed out in the truck and had nothing to do with the murder, which is very compelling impeachment evidence against Mr. M.'s testimony. And Mr. M. was a very biased witness. He was facing the death penalty, and he had the option to go forward on a case where he had confessed. If he testified against Mr. Bob. I understand why that's so critical, actually, even if it's true. I mean, if three guys decide to get a fourth, let's pick him up and teach him a lesson. I think it was some dope deal dispute or something. Let's teach him a lesson. And then the three of them get together and pick him up, and then one of them gets so drunk or high or whatever, so he passes out, and when they actually teach him the lesson, he's not even a participant. He'd still be guilty. He's an accessory before the fact. He aids and abets, and he's a co-conspirator. Only if they believed Joe M. and Henry Vancoma, and Joe M.'s initial statements did not implicate Mr. Bob, his initial statements to the police. There are so many different stories that these two people have given, and they are tremendously biased. If the investigator had presented some of these witnesses, there's a reasonable probability that the verdict would have been different. The other thing that they failed to uncover, which Mr. Bob's sister, right after the verdict, went out into the Shurz community. It's a small Indian reservation community in rural Nevada. In about a day and a half, she and her friend were able to collect 60 character letters on behalf of Mr. Bob that said, this guy is a drunk, and drunk or sober, he is not a violent man, and he would never do anything like that. At the same time, those people said, Henry Vancoma is violent. He's involved with this drug, complicated drug situation here. And this is exactly something that he would do. What was the state court resolution of the Donald Bob testimony? I mean, how did the Nevada state court treat that? Your Honor, the trial judge, who was also the post-conviction judge, found essentially that Mr. Bob had waived his effective assistance of counsel because he wanted to go forward with the trial. He also found that Mr. Morrison made a strategic decision based on his theory that they were going to go forward against Mr. Vancoma. I don't recall that the trial judge specifically addresses that issue at all. Did Morrison testify in that proceeding? He did. He did. How many murder cases did Morrison try? Your Honor, I'm sorry, I don't know the answer to that question. And I see that I have just a few seconds left. It's okay. You don't know? I don't know. The only thing I recall is that he was asked. What investigation did Morrison do? He spoke personally to my client's wife, his sister, Francine Conway, and Julio Zentejas, who are two people who actually testified for the prosecution at trial. And he looked at a report from Mr. M's lawyers, investigators, but as far as we know, he didn't ever actually obtain a copy of any of those reports. And that's it. Okay. Thanks. May it please the Court, Counsel, my name is Robert Whelan. I'm the Senior Deputy Attorney General employed by also the Attorney General of the State of Nevada. I have the privilege of representing Respondents Appellees in this particular matter. Let me ask you this. Morrison's investigation, he got a police report, right? There was much more to it than that, Your Honor. I haven't finished. He looked at the police report. He interviewed four witnesses. Is that right? We just heard their names. Well, actually, there was more than that, Your Honor. He said that he personally spoke to Lorraine Quintana, Francine Conway, Mr. Zentejas, and Clifton Bob. That was his testimony at the post-conviction matter. He also said he spoke to members of the Bob family, including Mr. Bob himself, regarding this particular matter. He testified that he had complete discovery from the State regarding this homicide. And in addition to that, he had ultimately Mr. M's complete trial file. And, of course, he had the benefit of what Mr. M's investigator had. That was the testimony during the course of the preliminary hearing. That's part of the problem with the Petitioner Appellant's manner on this, in that it's based on the ---- So he relied on the ---- he relied on the investigative material he got from counsel who was representing a co-defendant who is, Judge Kleinfeld would say, rolled over. Well, there was a point that Judge Kleinfeld made. Is that right? Yes. Mr. M ultimately rolled over and decided that he was going to testify against Mr. Bob. But can I get from you a description on a point that's important, at least in my thinking? If I can, Your Honor, of course. Can you summarize in a paragraph the trial testimony about the events leading up to taking Lee out to the desert, specifically Bob's involvement in that? What point was in the record where that was? Okay. First of all, it was Mr. Bob's truck that was being driven throughout this particular matter.  They went to the Arrowhead Lodge. They went to the Winner's Corner. There were a variety of places where they were ---- Let me get to the point. Did there come a point in time where, according to the trial testimony, they agreed they were going to take Lee out to the desert and get rid of him? Yes. There was testimony throughout that Mr. Bencoma had said that they, you know, were going to kill him. I mean, there's plenty of testimony indicating a variety of things relating to Mr. Bob's involvement, not the least of which it was his vehicle. They'd been drinking together. There was a discussion about killing the victim in this case, Mr. Lee. There was testimony. Actually, one of the points that was trying to be made was that Mr. Lee or, excuse me, Mr. Bob was passed out in the back of the truck. Francine Conway testified that one of the other people had indicated that to her. However, there was other testimony from other witnesses that Mr. Bob was not, in fact, passed out in the truck when this happened. And, indeed, even if you were to accept that testimony from Francine Conway, excuse me, the testimony that was given, it doesn't say exactly when. So there is a the, the, the test, there was testimony in the trial from someone that Bob was passed out in the back of the truck. Francine Conway. Passed out in the back of the truck. I beg your pardon, Your Honor. That Bob was passed out in the truck. Francine Conway, excuse me, testified, and you will find this at. Excerpt of the record 369. That Harold had killed the person after Bob had passed out. Okay. And was she, she must, she wasn't present at the murder scene. No, she was not. She's describing what someone else told her. She is relating, I can't remember, it was either Mr. Bencomo or Mr. M related. So would I be correct. Or Mr. Bob, because Mr. Bob had talked about this himself. Would I be correct in saying that even if Donald Bob, the defendant's, Petitioner's had been discovered by Mr. Morrison and put on as a witness at the trial, it would have been cumulative of the Conway testimony? That's my interpretation of it, Your Honor. Thank you. Let me ask you about a different topic, unless you have more to say in response to Judge Hawkins' question. I think that's basically covered it. Okay. My question is, I asked your adversary about prejudice, because Strickland requires two things. It requires conduct below the appropriate standard for the defense lawyer, and it requires prejudice. So I said, where are the affidavits about what would have happened if there had been an adequate continuance and an adequate investigation, in your view? Your adversary conceded that she had not briefed that, but said that if we looked at pages 15 through 22 and 39 through 47 of the excerpts, we could find it. Now, what that means is it's kind of a lurking issue, and I don't know if it's going to come up on the rebuttal argument or if it's going to come up in internal deliberations. But I want to give you an opportunity to be heard on it before it comes up behind your back. So what about prejudice? I appreciate that, Your Honor. The what counsel is referring to are. Don't worry. Don't worry. None of us are sneaky. Well, we're not going to. But I still don't know what the prejudice argument is. Well, on your back. Okay. What I am referring to initially is that 14 through 22 are merely the allegations in the amended petition. With respect to this, regardless, there are a couple of points. Regardless of to what extent Mr. Bob was told about the investigation, regardless of what the investigation showed, there simply isn't any prejudice in this particular matter because, first of all, regardless of anything that they have alleged, first of all, they haven't proven that any of these people would have come forward and testified in the manner that has been alleged. There was nothing like that in the state post-conviction matter. As I indicated previously, it was Mr. Bob's truck that was used. There's testimony that he drove it. There's testimony from multiple sources that he stabbed the victim. There's uncontradicted testimony that he tied the victim up after the stabbing and drove the truck and dragged him the half-mile to where the body was found. There's testimony that it was his knife and his own admissions. I would like the Court to note as well that there was the testimony of Ms. Sadequist. Wasn't there testimony that it was not his knife, the knife that was shown to witness? Yes. Defense counsel brought on Mr. Zendejas. The prosecution said, describe the knife. The knife was described for the prosecution. Defense counsel brought on Mr. Zendejas, who said, well, yes, Mr. Bob does, in fact, have a knife. However, the knife that I've seen him with does not match the description of the knife the prosecution says was used in this homicide. There's also the testimony from Ms. Sadequist, an excerpt of the record 335, that Bob had dried blood on his hands. Now, that's – there was a question about, you know, who was washing their hands and who had blood on their hands. But there was testimony from Ms. Sadequist, which has not been challenged, that Mr. Bob had dried blood on his hands. So if you look, take all of the testimony, and even if you were to give – You mean it was undisputed that he was caught red-handed? Oh, that's a very good pun, Your Honor, yes. It's not a joke. It's – that's what red-handed means. He was literally caught red-handed by Ms. Sadequist after this happened. She said she saw, as I recall, it was on one of his thumbs, dried blood. So – On one of his thumbs. I beg your pardon, Your Honor? On one of his thumbs. As I recall, that's – that's – I believe it was on one of his thumbs. The thumb aspect is what strikes me as part of the record. The bulk of the testimony that came in against Vern and Bob was the testimony of the other two gentlemen that were with him. Well, Mr. Bencoma and Mr. M testified, but there was also Francine Conway, Detective Lonnie Thompson, who pointed out that – whose testimony illustrated that Mr. Bob had lied to him about certain aspects when he talked to Mr. Bob. There was the Sadequist testimony that I just alluded to. But the part of it is, and Judge Kleinfeld talked about this, is that the situation changed. It really didn't change because – simply because Mr. M had now agreed to testify against Mr. Bob, the theory of the case for the defense is still the same. Blame it on Mr. Bencoma. Blame it on Mr. Bencoma. It was Mr. Bencoma that actually did this. And the idea or the suggestion that perhaps they didn't know what Mr. M was going to testify to, I think, is illusory at best, because they'd been working with Mr. M to figure out exactly how they were going to blame Mr. Bencoma for this. And, of course, the problem with Mr. Bob's situation is that he was – I beg your pardon. My time has expired. And we'll give you time. The problem is, is that there is still uncontroverted evidence that would establish him as an aider and abetter and a co-conspirator under Nevada law. I have a question if you're finished with that. Yes, Your Honor. I have gone – it's a little hard to read these ER pages, because there's a little court reporter's symbol down in the bottom corner. Yes. But I think I meant the page you referred me to, that there was testimony in the trial that Clifton Bob was passed out in the truck at the time of the crime. I'm in volume two of the appellant's excerpt of record. It's page 208 of the transcript. That's pretty legible. I have it, Your Honor. And down at line 24, there was a question, Clifton was passed out, question mark. You see that? Yes, I do. I've read immediately before that, immediately after that, and it looks like what that witness was talking about was whether Clifton Bob was passed out when the witness had the conversation with Bencoma, not that Clifton was passed out at the time of the crime. There's that interpretation, too, because what had happened, the testimony was, is that eventually they ended up at Francine Conway's place, where they took pictures afterwards, and Mr. Bob was in the photograph, I believe, with Mr. M and Mr. Bencoma. And that would explain that comment at that particular aspect during the course of the trial. There's that possible interpretation for it. But it doesn't change the result. Even giving Mr. Bob the benefit of everything else, he has failed to show any prejudice. Thank you for the additional time. Thank you. As Judge Hawkins noticed, Francine Conway's testimony was active. Could you talk louder? I couldn't hear you. I'm so sorry. As Judge Hawkins noted, Francine Conway's testimony is actually about a conversation that she has with Harold Bencoma when they are at her house later on the day of March 11th, and Clifton Bob has passed out, and while he is passed out at her house, they then have this conversation where Harry Bencoma tells her what happened. And that's what this refers to. There is no testimony at the trial that Clifton Bob was passed out in the truck when this happened. Additionally, with respect to the issue of prejudice, if I could just touch on the points where Mr. Bob would have been able to show prejudice. Henry Bencoma had a reputation for violence. There were a number of people. There are many letters presented to the trial court at sentencing. That's the same judge who heard the post-conviction action that explained this. He had a reputation for violence. Mr. Bob had a reputation for being nonviolent even when he was drunk to the point that people expressed shock that he couldn't possibly have done it. And those are all in letters that are in the excerpts from pages, I believe, 40 to 100 and about 120. Harry Bencoma had a motive because of his involvement in this drug trade. Mr. Bob did not have a motive. Harry Bencoma disposed of his clothing at Francine Conway's house. That testimony came out at trial. What didn't come out at trial is that a witness by the name of Roy Benner, who provided a notarized letter at post-conviction, would have testified that he gave Clifton Bob a ride home the next morning. He had no blood on his clothing. And then the statements that Donald Bob would have what he testified to at the hearing that Joe M. told him that Clifton Bob was passed out in a truck and had no involvement. Finally, I believe the trial testimony, just to clarify, a factual point is that the discussion what M. and Bencoma testified to was to the extent there was a discussion that something was going to happen. It was right before they got to where they were going out in the desert between while they were riding in the truck after all four of them had been picked up and were together. I have one quick question. Can you tell us from the record how much time elapsed, according to the testimony, between the commission of the murder and the conversation that was referred to at page 369? In other words, where Bencoma is talking with, is it Conway? With Francine Conway. Can you tell us, was that an hour later, 30 minutes later, a day later? It's a few hours later. Mr. Lee is killed sometime around 7 in the morning. He was there at the market at about 6.30. And that happened sometime around 7. There's a few other things that happened. I believe Francine said they got to her house at about 10 a.m., so within a few hours. Okay. Thank you. Thank you very much. The matter will stand submitted. We'll come now to the United States versus Hawaii Arrow. Thank you.
judges: Pregerson, Kleinfeld, Hawkins